# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**TESSA HOLLOWAY**                                                    **PLAINTIFF**

**VERSUS**                                                    **NO. 23-692-SSD-RLB**

**ABBVIE, INC., ET AL.**                                                    **DEFENDANTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFFS' FIRST AMENDED, SUPPLEMENTAL AND/OR RESTATED COMPLAINT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, **TESSA HOLLOWAY**, an individual of the full age of majority, domiciled in the Parish of East Baton Rouge, State of Louisiana, who respectfully represents as follows:

1.

Made Defendants herein are:

a.  **ABBVIE, INC.,** individually, and as successor to Allergan, Inc., Allergan PLC, and Zeltiq Aesthetics, Inc., a Delaware corporation with its principal place of business in Louisiana located at 1070-B West Causeway Approach, Mandeville, 70741. Defendant AbbVie, Inc., is the owner, manufacturer, and distributor of the CoolSculpting® medical device, which it distributes and markets throughout Louisiana. AbbVie, Inc., who, at all material times, does, and regularly has, conducted business in every Parish in the State of Louisiana, including East Baton Rouge Parish. Abbvie, Inc., may be served through its registered agent for service of process, Corporate Creations Network, Inc., 1070-B West Causeway Approach, Mandeville, LA 70471.

b.  **ALLERGAN, PLC,** is a corporation formed under the laws of the State of Delaware with a principle place of business located at 2525 Dupont Drive, Irvine, CA, 92612, and may be served with process pursuant to the Louisiana Long Arm Statute.

c.  **ALLERGAN, INC.,** is a corporation formed under the laws of the State of Delaware with a principle place of business located at 2525 Dupont Drive, Irvine, CA, 92612, and may be served with process pursuant to the Louisiana Long Arm Statute.

d.    **ZELTIQ AESTHETICS, INC.,** is a corporation formed under the laws of the State of Delaware with a principle place of business located at 4410 Rosewood Dr, Pleasanton, CA 94588, and may be served with process pursuant to the Louisiana Long Arm Statute.

2.

Venue is proper in East Baton Rouge Parish because Plaintiff is a resident of East Baton Rouge Parish, the tortious acts and/or omissions which gave rise to this cause of action occurred in East Baton Rouge Parish, and because the damages to Plaintiff were sustained in East Baton Rouge Parish.

3.

Upon information and belief, Defendant, AbbVie, Inc., acquired Allergan PLC., Allergan, Inc., and Zeltiq Aesthetics, Inc., on May 8, 2020, and is the current owner of the CoolSculpting® system. These parties are collectively referred to as Defendants in this matter. The Defendants at all material times mentioned herein and prior thereto was engaged in the business of manufacturing, selling, marketing distributing, and otherwise placing into the stream of commerce the CoolSculpting® system as follows:

a.    Upon information and belief, Zeltiq Aesthetics, Inc., created, designed, manufactured, labeled, marketed, advertised, distributed, and sold the CoolSculpting® system medical device to induce lipolysis in the body.

b.    Upon information and belief, on or about April 28, 2017, Allergan PLC, and Allergan Inc., acquired Zeltiq Aesthetics, Inc.

c.    Upon information and belief, on May 8, 2020, AbbVie, Inc., acquired Allergan PLC, Allergan, Inc., and Zeltiq Aesthetics, Inc., taking over all of the companies' assets and liabilities. It is now the

owner of the CoolSculpting® system medical device and is liable for the claims set forth herein.

4.

This case arises from a popular non-invasive fat reducing medical device called the CoolSculpting® system, which can cause permanent deformities to a person's body.

**DEFENDANTS' COOLSCULPTING® SYSTEM**

5.

Defendants' CoolSculpting® system is a medical device that supplies intense cooling to targeted areas of the body to induce lipolysis – essentially to reduce stubborn fat bulges "in the areas that bother you most" promising "up to 20-25% reduction in fat layer thickness after a single session." The underlying technology is known as Cryolipolysis®, a non-invasive procedure which involves the selective reduction of fat bulges through the controlled cooling of subcutaneous fat tissue, essentially freezing fat cells and programming them to die.

6.

Defendants' CoolSculpting® system's primary purpose is for Cryolipolysis® treatments or cold-assisted lipolysis (breakdown of fat).

7.

The CoolSculpting® system device is a Class II prescription medical device that should be only sold to physicians, and is the only medical device in the United States with FDA clearance to offer body contouring services via Cryolipolysis®.

8.

The CoolSculpting® system device's suction applicators are applied to a treatment areas on a person's body for 30 to 60 minutes. Each application is called a "cycle." A person may undergo multiple cycles in one CoolSculpting® session, depending on the size of the area to be treated with Cryolipolysis®.

9.

Defendants have, at all material times, and continues to, extensively marketed and promoted its CoolSculpting® system to the public. At all material times, Defendants have used the same or similar language and messaging throughout its advertisement materials. The CoolSculpting® system is advertised and marketed as a non-invasive and surgery-free procedure that is an alternative to liposuction and other fat reducing surgeries, promising to reduce fat up to 20-25% after only one session. CoolSculpting® claims that the fat reduction after the procedure is long lasting and the device permanently kills the fat.

10.

The CoolSculpting® system has received substantial press coverage in the national media for non-invasive, cosmetic, body-contouring, including features on television shows such as The Today Show, Good Morning America, The CBS Early Show, The Rachel Ray Show, The Dr. Oz Show, Extra, Nightline, The Doctors, and E! News, and in magazines such as O, Elle, Marie Claire, Allure, Men's Fitness, Town & Country, Elevate, W, and Vie.

11.

CoolSculpting® is not only a medical device, but a brand name that consumers seek out due to Defendants' direct advertising. CoolSculpting® providers is not prescribed

based on independent judgment of providers based on patient need, but at the consumer/patient's request.

12.

The CoolSculpting® system is not only marketed to the general public, but Defendants aggressively pursued providers, including doctor's offices, medical spas, laser hair removal clinics, and other cosmetic procedure establishments, to sell the CoolSculpting® system.

13.

Defendants aggressively partners with individual CoolSculpting® providers, paying for local ads to promote CoolSculpting® services at the providers' clinics.

14.

Defendants inject itself into the provider's CoolSculpting® practice and becomes entangled in the patient's medical treatment with the device. The Defendants' system is strategically designed to financially benefit the Defendants so long as consumers continue to undergo the CoolSculpting® procedure.

15.

Defendants controlled and continues to maintain control of all aspects of CoolSculpting® providers' CoolSculpting® business.

16.

The CoolSculpting® system is specifically programmed to only function with the use of "cycles" which are consumables that CoolSculpting® providers must buy from Defendants in order to operate the medical device. A cycle is an authorization to perform one procedure to one specific area on the body and providers can only perform a treatment

if they have purchased a cycle. Defendants make more money selling the cycles to CoolSculpting® providers than on selling the CoolSculpting® devices.

17.

Defendants, at all material times closely, controlled, and continue to closely control, the CoolSculpting® providers' sales methods of the medical procedure.

18.

Defendants collect data from its medical devices, completely bypassing the CoolSculpting® medical providers. To help promote sales and pressure CoolSculpting® providers to sell more procedures, Defendants installed a device, called CoolConnect inside each CoolSculpting® system that automatically reports information about each cycle administered by the CoolSculpting® providers directly to the Defendants.

19.

At all material times, Defendants controlled how CoolSculpting® providers advertised CoolSculpting® services, establishing a minimum advertised price policy, restricting CoolSculpting® providers from independently setting and advertising prices, and penalizing CoolSculpting® providers that advertise a lower price for CoolSculpting® services.

20.

At all material times, Defendants provided CoolSculpting® providers with advertisement materials directed at CoolSculpting® patients.

21.

At all material times, Defendants provided documents and forms to CoolSculpting® providers to use when administering the CoolSculpting® procedure to

patients, including consent forms with vague language about Paradoxical Hyperplasia (PH).

22.

These documents, brochures, posters, and forms provided by Defendant to CoolSculpting® providers depicts the CoolSculpting® logo and promotes the Defendants' device.

23.

Defendants created a "liposuction program" wherein Defendants promised CoolSculpting® providers that it would cover liability claims for PH if a patient develops the adverse effect. Defendants offer to refund patients or pay them for one liposuction procedure to correct the adverse effect in exchange for a release of liability. This program misled and misleads CoolSculpting® providers to believe that the condition can be successfully corrected with a single liposuction procedure, if required, and assuaged providers as to any worry about the adverse effect.

24.

Defendants created a unique system of control whereby Defendants used CoolSculpting® providers to sell CoolSculpting® procedures on its behalf, effectively taking away CoolSculpting® providers' independence in treating patients with the CoolSculpting® medical device.

**ADVERSE EFFECT: PARADOXICAL HYPERPLASIA (PH)**

25.

Defendants knew, since at least 2011, that its product could cause Paradoxical Hyperplasia (PH), also referred to as Paradoxical Adipose Hyperplasia (PAH), an

enlargement and hardening of tissue in the treated area, which is the opposite effect of the medical device's advertised purpose. Instead of permanently killing fat cells, the CoolSculpting® device permanently damages the tissue leaving significantly larger sized deformities on the patient's body. PH is permanent and does not resolve on its own, nor does the tissue affected by PH respond to weight loss. Rather, the only method of treatment is invasive surgery. PH is an adverse effect of CoolSculpting® and is a permanent condition that is developed only as a result of undergoing CoolSculpting® treatment.

26.

Defendants have received thousands of reports of CoolSculpting® consumers that have developed PH after undergoing the CoolSculpting® procedure.

27.

Upon information and belief, PH, as seen in CoolSculpting® patients, is not known to occur naturally. Upon information and belief, Defendants' internal investigation of the condition revealed that PH tissue is consistent with fibroplasia, which is fibrosis – scarring – of the treated tissue. This is an irreversible process and the only management of fibroplasia is surgical excision.

28.

Management of PH is a difficult process, requires numerous various invasive surgical procedures, including power assisted liposuction, liposculpture, excision, abdominoplasty, and laser treatment for scarring. These invasive and aggressive methods require long recovery time and have unpredictable results. Even with surgeries, a full reconstruction of the area is not guaranteed. A person with PH is at risk for future health problems, including the return of the deformity after surgery. Upon information and belief,

Defendants have known that PH tissue can recur after surgery and in some cases cannot be fully removed.

29.

Upon information and belief, since 2011, Defendants frequently and consistently received reports of consumers developing PH after CoolSculpting®. Defendants investigated the new phenomenon and knew that the CoolSculpting® device caused a pathological change to the tissue resulting in fibrosis of the treatment area, disfiguring the body. Defendants named the condition "Paradoxical Hyperplasia" and in 2012, Defendants created its own diagnosis criteria for the condition.

30.

PH arises from CoolSculpting® and is a new medical condition related to that specific medical device. Accordingly, PH is a condition not generally known by the medical community. CoolSculpting® providers relied upon Defendants for information about the condition. Defendants never directly notified CoolSculpting® providers about its post-market discovery of PH or what it knew about the deforming condition through the adverse event reports it had received since at least 2011.

31.

Upon information and belief, Defendants performed its own studies on PH to determine the cause of the condition and never released the findings of its studies to CoolSculpting® providers or the public. Upon information and belief, Defendants knew that people with PH must undergo multiple invasive surgeries to manage it, requiring long recoveries, pain, health risks, and financial expenditures.

32.

Defendants developed its own system to re-evaluate reports of PH remotely through its internal "Medical Safety Team" whereby it rejected many reports of PH, despite medical providers' diagnoses. Defendants guided CoolSculpting® providers in determining whether a patient should be diagnosed with PH through its Medical Safety Team or a similar department, with Defendants' employees reviewing the patients' medical information and documents and suggesting to the CoolSculpting® providers whether or not a patient should be diagnosed with PH. Defendants instructed CoolSculpting® providers to follow a very narrow protocol for diagnosing patients with PH, resulting in many patients not obtaining a PH diagnosis despite suffering tissue damage from CoolSculpting®.

33.

Defendants' system automatically turned the adverse event reporting process into a claims process. Defendants instructed providers to submit Clinical Event Forms and other documents, including a copy of the consent signed by the patient with the language describing PH. The Clinical Event Form requested personal information about the patient which the Defendants used to contact patients directly and solicit settlement in exchange for a release of liability. Through the adverse reports and the "liposuction program," Defendants made itself the centralized hub of information about PH. Defendants had direct communications with CoolSculpting® providers and CoolSculpting® patients that developed PH, allowing Defendants to collect information not available to anyone else. Through its program, Defendants knew that the CoolSculpting® providers used CoolSculpting® consent forms that were identical or mirrored the language drafted by

Defendants in regards to PH which did not accurately represent the condition to the CoolSculpting® patients.

34.

Upon information and belief, by 2012, Defendants knew that patients could develop PH in every CoolSculpting® treatment area. By 2013, Defendants knew that various types of surgeries had been required to remove PH masses, with Defendants estimating in 2013 the incident rate being 1 in 3,500 patients. However, the number of people developing the condition was increasing exponentially, and Defendants knew it had seriously underestimated the frequency of PH, yet did not notify CoolSculpting® providers, the public, or the FDA about the substantial increase in incidence rate.

35.

Through its own investigation of PH, the adverse event reports, and the liposuction program, Defendants were the only one with the true knowledge about the extent, severity, and frequency of the condition.

36.

Defendants never notified CoolSculpting® providers about its post-market discovery or PH or what it knew about the deforming condition that it received since 2011. Defendants strategically used an inaccurate 2014 JAMA article in its training materials, referring to the article when CoolSculpting® providers asked questions about PH, even though Defendants knew that the information was misleading in regard to the number of PH reports, the incidence rate of PH, the range of presentation of PH, and the extent and severity of damage.

37.

From 2012 to date, Defendants never updated the CoolSculpting® system User Manual to reflect updated information about PH.

38.

Upon information and belief, Defendants manipulated the calculation of the incidence rate and stated inaccurate incidence rate statistics to CoolSculpting® providers and instructed its employees to use the words "rare" when referring to PH in their communications with CoolSculpting® providers, the public, and the FDA.

39.

Upon information and belief, Defendants downplayed the seriousness, permanency, and frequency of PH to CoolSculpting® providers, the public, and the FDA.

40.

Upon information and belief, Defendants failed to report all known incidents of PH to the FDA.

41.

Defendants deprived consumers of being properly informed about the risk of PH. Defendants withheld critical information about PH from CoolSculpting® providers, entangled itself in the providers' CoolSculpting® business, and gave providers assurance that if a patient developed PAH, Defendants would cover the claim with its "liposuction program." The Defendants' actions resulted in providers not understanding the gravity of the adverse effect and thereby could not disclose the risk thereof to their patients. As a result of the Defendants' conduct, the CoolSculpting® providers could not advise patients, including Plaintiff, in this case, adequately about the risk of PH.

41 A.

Pursuant to information and belief, Plaintiff's treating physician Dr. Ann Zedlitz (Dr. Z) would not have performed / prescribed the CoolSculpting® procedure had Dr. Z been adequately warned by the defendant of the full risks associated with the CoolSculpting® procedure as set forth herein.

41 B.

Pursuant to information and belief, if Plaintiff's treating physician had been provided with updated information that showed an increased likelihood of the plaintiff developing Paradoxical Adipose Hyperplasia (PH) from the CoolSculpting® procedure as set forth herein, Dr. Z would not have performed the procedure on Plaintiff.

41 C.

Based on Information and belief, Plaintiff's treating physician Dr. Z would not have performed / prescribed the CoolSculpting® procedure had Dr. Z been properly informed that following the procedure and confirming Plaintiff's diagnosis of PH, Plaintiff would not be admitted into defendant's "liposuction program."

41 D.

But for Defendant's failure to adequately warn physicians of the issues and risks associated with use of the CoolSculpting® procedure, Dr. Z would not have performed the CoolSculpting® procedure on Tessa Holloway.

42.

Thus, Plaintiff was unknowingly and inappropriately subjected to the risk of the CoolSculpting® procedure.

## PLAINTIFF'S INJURY

43.

Plaintiff, Tessa Holloway, learned about the non-invasive procedure, CoolSculpting®, to reduce stubborn fat on her abdominal area at her dermatologist's office, Z Aesthetic Dermatology. Seeing the CoolSculpting® advertisements, Plaintiff was interested in the CoolSculpting® procedure.

44.

On June 21, 2022, Plaintiff underwent CoolSculpting® treatment at Z Aesthetic Dermatology, located at 5305 Flanders Drive, Baton Rouge, Louisiana, to reduce the stubborn fat on her upper abdomen (below breasts), mid abdomen (above and below umbilical region), and lower abdomen (suprapubic region).

45.

Within the next couple of months after the CoolSculpting® treatment, Plaintiff presented for follow-up visits where she was noted to have swelling and no positive improvement; in fact, she gained weight. At each follow-up appointment, Plaintiff had complaints of having a larger abdomen than before the CoolSculpting® treatment, and her concerns, weight, and photographs were documented at each appointment.

46.

After several follow-up appointments for the CoolSculpting® treatment, Plaintiff's PH diagnosis was confirmed by Dr. Zedlitz. The diagnosis was confirmed per the

Defendants' "Clinical Event Form – Paradoxical Hyperplasia Checklist" and the completed
Clinical Event Form was submitted to Defendants.

47.

On November 11, 2022, the medical team for Defendants confirmed that Plaintiff's
case was consistent with PH.

48.

Plaintiff was informed that she would require surgical intervention, including
abdominoplasty and liposuction, to manage PH, which she has undergone. She will also
require continued invasive surgical management of PH.

49.

As a result of Defendants' systemic failure to adequately warn CoolSculpting®
providers about the danger of the CoolSculpting® medical device, Plaintiff's
CoolSculpting® provider was not adequately warned of the severity, permanence, and
likelihood of PH, the adverse effect of CoolSculpting®, and the invasive and aggressive
surgical treatments required to manage PH.

50.

As a result of the Defendants' conduct, Plaintiff was not properly informed about
PH prior to undergoing CoolSculpting®.

51.

Had Plaintiff been properly informed of the extent of PH's seriousness, incidence,
permanence, and the true likelihood that she would develop this condition that results in
the exact opposite effect of the device's advertised purpose, Plaintiff would not have
undergone the CoolSculpting® procedure.

52.

Defendants knew or reasonably should have known that the CoolSculpting®
product that it manufactured, produced, marketed, and sold to Plaintiff had the likelihood
of resulting in the serious, permanent, and deforming adverse effect of PH.

53.

Defendants should have ensured that the CoolSculpting® product it produced,
manufactured, marketed, and sold in Louisiana, and specifically to Plaintiff, Tessa
Holloway, was free of the likelihood of resulting in the serious, permanent, and deforming
adverse effect of PH.

54.

Defendants should have ensured that the CoolSculpting® product it produced,
manufactured, marketed, and sold in Louisiana, and specifically to Plaintiff, Tessa
Holloway, included appropriate warning to both CoolSculpting® providers and
CoolSculpting® patients of the likelihood of resulting in the serious, permanent, and
deforming adverse effect of PAH.

55.

At the time that CoolSculpting® was produced, manufactured, marketed, and sold
in Louisiana to CoolSculpting providers and patients, and specifically to Plaintiff,
Defendants were aware and/or should have reasonably been aware of the likelihood of
CoolSculpting® treatment resulting in the serious, permanent, and deforming adverse
effect of PH.

56.

Therefore, Defendants breached the duties it owed to Plaintiff, Tessa Holloway, in the following non-exclusive ways:

a.      Failure to design the CoolSculpting® medical device without the high incidence and likelihood of PH, a serious adverse effect;

b.      Failing to sell a medical device without the high incidence and likelihood of PH, a serious adverse effect;

c.      Failing to select a process that did not result in the high incidence and likelihood of PH, a serious adverse effect;

d.      Failing to adequately warn CoolSculpting® providers and patients about the device's ability to cause harm, specifically, to result in the high incidence and likelihood of PH, a serious adverse effect;

e.      Intentionally and/or negligently concealing material facts about the high incidence and likelihood of PH, a serious adverse effect, from CoolSculpting® providers and patients;

f.      Intentionally and/or negligently misrepresenting material facts about the high incidence and likelihood of PH, a serious adverse effect, from CoolSculpting® providers and patients;

g.      Failing to use reasonable care in warning CoolSculpting® providers and patients about the high incidence and likelihood of PH, a serious adverse effect; and,

h.      Any and all other acts which may be revealed at the trial of this matter.

57.

Under the Louisiana Products Liability Act ("LPLA"), Defendants, as the manufacturer of the CoolSculpting® device treatments that were sold to and that injured Plaintiff, Tessa Holloway, is responsible for all injuries associated with the sale of the treatments as the device was: unreasonably dangerous in construction and design; unreasonably dangerous in construction or composition; Defendants failed to provide an adequate warning; and the device did not conform to any express or implied warranty of the manufacturer. At all material times, the Defendants maintained control of the medical device and knew that the medical device had the high incidence and likelihood of the serious, permanent adverse effect of PH.

58.

Moreover, the Defendants marketed and sold the CoolSculpting® system with conscious disregard for the safety of the patients undergoing treatments.

59.

But for the Defendants' gross negligence and conscious disregard for the safety of patients of its device, Plaintiff would never have suffered from PH, and all the continued treatment necessitated by PH.

60.

The Defendants' misrepresentations, concealment of material facts, and withholding of pertinent information regarding the likelihood and severity of its adverse effect constitutes gross negligence. The Defendants' intentional misrepresentations and concealment of material facts as to the adverse effect demonstrates the absence of even slight care and diligence, demonstrating an indifference to Plaintiff's safety.

61.

Plaintiff, Tessa Holloway, suffered the following severe physical and emotional injuries as a direct result of Defendants' actions:

a.    Past and future physical pain and suffering;

b.    Past and future mental and emotional anguish;

c.    Bodily injury and disfigurement;

d.    Past and future loss of enjoyment of life;

e.    Past and future medical expenses;

f.    Past and future lost wages;

g.    Past and future disability; and,

h.    Any and all other damages that this Court might find reasonable on the premises.

62.

Plaintiff anticipates expert testimony will be required and prays that all expert fees and expenses incurred by her be taxed as costs.

**THIRD PARTY BENEFICIARY**

63.

Pursuant to La.C.C. art. 1978, a contracting party may stipulate a benefit for a third person called a third-party beneficiary. Under Louisiana law, there is no requirement that a contract which creates a benefit for a third party be in writing. *Zaveri v. Condor Petroleum Corp.*, 27 F. Supp. 3d 695, 703 (W.D. La. 2014)

64.

In the instant case, Defendants assured Dr. Z, Plaintiff's treating physician, that in the event any of Dr. Z's patients were ever diagnosed with PH as a result of the CoolSculpting® procedure, that such patients would be accepted into Defendants "liposuction program" and that Defendants would be responsible for such patients' medical costs to remedy the PH. Absent those assurances by Defendants, Dr. Z would not have recommended the CoolSculpting® procedure to her patients. Such assurances created a third-party beneficiary contract under Louisiana law pursuant to La.C.C. art 1978.

65.

Plaintiff's treating physician, Dr. Z, moved forward with recommending and performing the CoolSculpting® procedure on plaintiff, Tessa Holloway, based on Defendants' assurances that Tessa Holloway, as a patient of Dr. Z, would be accepted into the "liposuction program" and that all costs to remedy adverse affects of the procedure, specifically PH, would be borne by Defendants. Accordingly, Tessa Holloway is a third-party beneficiary of the contract between Defendants and Dr. Z.

66.

To date, and after Plaintiff was medically diagnosed with PH, she has not been admitted into Defendants' "liposuction program."

67.

Accordingly, and in addition to the damages set forth above, Plaintiff requests that she be reimbursed for all expenses she has incurred to date for the liposuction procedure she had to remedy the adverse effects of PH, and for all costs for future treatment to remedy the PH caused by the CoolSculpting® procedure performed on Plaintiff due to the breach of the third-party beneficiary contract between Defendants and Dr. Z.

### JURY REQUEST

Plaintiff requests a trial by jury on all issues.

**WHEREFORE,** Plaintiff, **TESSA HOLLOWAY**, prays that the Defendants, **ABBVIE, INC., ALLERGAN, PLC, ALLERGAN, INC. AND ZELTIQ AESTHETICS, INC.,** be duly cited and served as the law prescribes, and after due proceedings had, there be judgment rendered in favor of Plaintiff and against the Defendants for such damages as are reasonable in the premises, with legal interest thereon from the date of filing and all costs of these proceedings, including expert witness fees and for all other damages as may be proven at the trial.

**PLAINTIFF FURTHER PRAYS** that all expert fees, deposition expenses and travel expenses be taxed as costs.

Respectfully submitted, this the 27 day of February, 2024.

By:    /s/      Colt J. Fore
**BRENT P. FREDERICK (#25053)**
**MICHAEL T. BECKERS (#30197)**
**DANIELLE N. GOREN (#34563)**
**COLT J. FORE (# 34288)**
Dudley DeBosier Injury Lawyers
112 Founders Drive
Baton Rouge, LA  70810
(P) 225-251-4035
(F) 225-251-4085
CFore@DudleyDeBosier.com
*Attorney For Plaintiff*
(P) 225-251-4035
(F) 225-251-4085
CFore@DudleyDeBosier.com
*Attorney For Plaintiff*